Chief Judge Fuld.
In this case, we are called upon to decide the constitutionality of a statute requiring a parent to contribute to the support of a minor child institutionalized following a determination and order of the Family Court adjudicating him " a juvenile delinquent ’ ’ and " a person in need of supervision ’ ’.
On February 19, 1970, following a juvenile delinquency proceeding in which he admitted taking part in a burglary, the Family Court, Monroe County, committed the appellant’s 14-year-old son to Berkshire Farm for Boys. A short time later, the petitioner, who is Director of the county’s Social Services District, brought this proceeding against the appellant for her son’s support, pursuant to section 233 (subd. [b]) of the Family Court Act.[1] She challenges the constitutionality of the statute *8 on the ground, among others, that it denied her equal protection of the law because parents of other youngsters — such as wayward minors — institutionalized on criminal or quasi-criminal charges, are not required to contribute to their support. The court, rejecting the argument, ordered her to pay $600 toward her son’s support at the Farm for the period between April 15 and December 31, 1970 — which amounted to approximately $70 a month.[2] Belying upon our decision in Matter of D. (Daniel) (27 N Y 2d 90, cert. den. 403 U. S. 926) —which denied juvenile delinquents a right to a jury trial —the court found it constitutionally permissible to distinguish between the latter and other types of young offenders vis-á-vis parental obligation to make support payments.
Some years ago, the Court of Appeals, in a closely divided decision, held that section 56-a of the Domestic Relations Court Act of the City of New York imposed upon a stepmother a duty to contribute to the support of her stepson, placed in an institution following his adjudication, as a juvenile delinquent, when the amount contributed by the child’s father was insufficient to pay the full cost of such support. (See Department of Welfare of City of N. Y. v. Siebel, 6 N Y 2d 536.) In reaching the conclusion it did, the court necessarily assumed the constitutional validity of the statute which, insofar as it rendered a parent liable for his child’s support, is somewhat similar to the one now under consideration. However, since the question of constitutionality here raised was not expressly discussed, we address ourselves to it now.[3]
Since a parent is under a duty to support his child (Family Court Act, §§ 412, 413), it may not be said that the statute now before us, section 233 (subd. [b]), deprives the appellant of her property without due process of law. Her equal protection argument does, however, require more extended treatment. There is “no denial of equal protection of the laws ’’, *9 we recently wrote, ‘ ‘ if the differentiation made [between classes of persons] rests upon some rational consideration and is not palpably arbitrary. ‘ [T]he standards of equal protection * * * are met if a classification, or a distinction among classes, has some reasonable basis.’ (Matter of Bauch v. City of New York, 21 N Y 2d 599, 607 * * *.) ” (Gleason v. Gleason, 26 N Y 2d 28, 41; see, also, Bucho Holding Co. v. State Rent Comm., 11 N Y 2d 469, 477.) Although a state “ may not draw a line which constitutes an invidious discrimination against a particular class ”, the United States Supreme Court has said, it “ has broad power when it comes to making classifications ”, particularly in social and economic matters, as long as “the line drawn is a rational one.” (Levy v. Louisiana, 391 U. S. 68, 71-72; see, also, Glona v. American Guar. Co., 391 U. S. 73, 75.)
In the case before us, the appellant manifestly has no real ground for complaint simply because her responsibility for the support of her child continues while he is at Berkshire Farm. Her argument must necessarily be that his confinement and treatment are so similar to those for other incarcerated minors that there is no reasonable basis for relieving the parents of the latter children from their support obligations and that, in consequence, she is being invidiously discriminated against. The contention lacks force; in our view, the background and underlying purposes of the two types of confinement make it reasonable to distinguish the support obligations of such parents.
The Family Court — as the Joint Legislative Committee on Court Reorganization declared in 1962 in dealing with the then proposed new state-wide Family Court Act—is “ a special agency for the care and protection of the young and the preservation of the family ” (1962 report, part 11, The Family Court Act, p. 2). And, as bearing on that, we would emphasize — to quote from a California case — that “the basic philosophy of the juvenile court [which is similar to our Family Court] recognizes that the normal relationship of parent and child should not be disturbed except to insure protection of the public and the welfare of the child; that where interference with that relationship is necessary and warranted it should not extend beyond what is necessary to effect the necessary corrective measures; *10 and that such measures as are taken should be directed to the restoration of a normal parent-child relationship.” (County of Alameda v. Espinoza, 243 Cal. App. 2d 534, 548.) It followed, therefore, concluded the California court, that it was not unreasonable to impose the obligation of support upon the father of a boy institutionalized by the juvenile court.
The circumstance that safeguards afforded defendants in criminal cases are being increasingly accorded juvenile delinquents (see, e.g., In re Winship, 397 U. S. 358, revg. Matter of Samuel W., 24 N Y 2d 196; In re Gault, 387 U. S. 1) does not narrow the difference between them and other youthful criminals ; such safeguards have been afforded solely to assure them additional protection and treatment. Judge Bergan’s statement in his opinion for the majority in Matter of Samuel W. still reflects this court’s original purpose; “young juvenile offenders ”, he wrote, are to be held “ as children apart from the usual methods and ineradicable consequences of the criminal law ’ ’, for the design of Family Court proceedings and the intent of its judges are “ not to punish, but to save the child ” (24 N Y 2d 196, 197, revd. on other grounds, sub nom. In re Winship, 397 U. S. 358, supra; see, also, People v. Lewis, 260 N. Y. 171).
Quite different, however, is the treatment accorded wayward minors, youthful offenders and other young criminals.[4] The proceedings leading to their incarceration, governed by the Code of Criminal Procedure, are, this court declared in People v. James (9 N Y 2d 82, 87), “ adversary ” in character. The public safety factors involved in their release are deemed much more important than those connected with juvenile delinquents. Rehabilitation is, of course, a factor, a hopefully desired goal, in the treatment of every type of criminal, and there are special reformative and rehabilitative measures applied and adapted to young criminals. Significantly, however, other than the provision for possible commitment of a wayward minor to a parent *11 following Ms return from institutional commitment (Code Grim. Pro., § 913-d), there is no provision for parental participation in proceedings leading to adjudication, disposition and placement of these youths, as there is in the case of juvenile delinquents. Moreover, the punitive and custodial aspects of their incarceration are much more rigorous than those prescribed for juveniles and, for the State’s own protection, much more closely resemble those mandated for adult criminals.
There is thus ample ground for differentiating not only between juvenile delinquents and young criminals but also between their respective parents. In short, there is an entirely rational basis, first, for treating juvenile delinquents as still in a familial situation, though institutionalized for schooling and treatment, with their parents unrelieved of the statutory requirement of support, and, second, for placing the parents of youthful criminals in the same category as those of adult criminals, whose expenses are completely underwritten by the public for its own advantage and benefit. Certainly, it constitutes no “ invidious discrimination ’ ’ to require the parents of juvenile offenders to continue their duty of support if institutional treatment is indicated and directed. That it might also prove a wise and beneficial procedure to impose the same obligation upon the parents of youthful criminals is not the court’s concern. The nontreatment and public protection features of the latter’s incarceration are sufficiently important to warrant their confinement at public expense. The treatment aspects of the commitment of juvenile delinquents are so prominent that it is not unreasonable to mandate parental contribution toward their support.
The judgment appealed from should be affirmed, without costs.
Judges Burke, Scilbppi, Bergan, Breitel, Jasen and Gibson concur.
Judgement affirmed.

. Section 233 (subd. [a]) of the Family Court Act makes the support of a child committed to an “ authorized agency ” by the Family Court chargeable to the county of the child’s residence; section 233 (subd. [b]), insofar as pertinent, reads as follows: “ The court may, after issuance and service of an order to show cause upon the parent or other person having the duty under the law to support such child, adjudge that such parent or other person shall pay to the court such sum as will cover in whole or in part the support of such child ”. Section 110 of the Social Services Law (formerly Social Welfare Law) contains a similar provision applicable to juvenile delinquents committed to a “ state institution ” in the State Department of Social Services.

. The county, we were told on oral argument, was paying the institution about $1,000 a month.

. The stepmother in the Siebel case (6 N Y 2d 536, supra) did urge that the legislation deprived her of property without due process, but solely upon the ground that it did not afford her an opportunity to be heard. The three judges who dissented did not reach the constitutional question, since it was their view that the statute covered only a natural parent, the father or mother, and did not include a stepmother.

. Unlike juvenile delinquents, who range in age from 7 to 16 years and may be committed to no institution more confining than a training school (Social Services Law, § 430), wayward minors (whose age range is 16 to 21 years) and youthful offenders (aged 16 to 19) may be incarcerated in the more restrictive type of “ reformative institution authorized by law to receive commitments of persons over the age of sixteen years” (Code Crim. Pro., §§ 913-c, 913-m [cf. CPL, art. 720, eff. Sept. 1, 1971]).