36 Cal.3d 1 (1984)
678 P.2d 917
201 Cal. Rptr. 342
In re JERALD C., a Person Coming Under the Juvenile Court Law.
COUNTY OF SANTA CLARA, Plaintiff and Respondent,
v.
HIRAM G., Defendant and Appellant.
Docket No. S.F. 24392.
Supreme Court of California.
April 20, 1984.
*3 COUNSEL
Terry A. Green and Dreyer, Shulman, Dubbin, Kraft & Green for Defendant and Appellant.
*4 Alden J. Fulkerson, Margaret Crosby, Alan L. Schlosser, Amitai Schwartz and Cynthia L. Remmers as Amici Curiae on behalf of Defendant and Appellant.
Selby Brown, Jr., and Donald L. Clark, County Counsel, Ann Miller Ravel, Acting County Counsel, Debra L. Cauble and Thomas Wm. Cain, Deputy County Counsel, for Plaintiff and Respondent.
Donald L. Clark, County Counsel (San Diego), Lloyd M. Harmon, Jr., Chief Deputy County Counsel, Arlene Prater, Deputy County Counsel, John K. Van de Kamp, Attorney General, Daniel J. Kremer, Chief Assistant Attorney General, William D. Stein, Assistant Attorney General, Gloria F. DeHart and Mary A. Roth, Deputy Attorneys General, John H. Larson, County Counsel (Los Angeles), Robin A. Ruffra, Deputy County Counsel, L.B. Elam, County Counsel (Sacramento), John H. Dodds, Deputy County Counsel, John Dougherty, District Attorney (Sacramento), and Michael E. Barber, Deputy District Attorney, as Amici Curiae on behalf of Plaintiff and Respondent.
OPINION
BROUSSARD, J.
The father of Jerald C., a minor, appeals from an order requiring reimbursement to the County of Santa Clara for the costs of the care and support of Jerald while in custody.
Jerald was declared a ward of the court pursuant to Welfare and Institutions Code section 602[1] and was placed in custody at juvenile hall and boys ranch. He was subsequently committed to the California Youth Authority. The county sought reimbursement under the provisions of section 903 at the rate of $265 per month for juvenile hall and boys ranch custody for periods prior to September 1980, at the rate of $33 per day for 33 days in juvenile hall in October and November 1980, and at the rate of $25 per month for the subsequent commitment to the California Youth Authority. After a hearing, appellant was ordered to pay the above amounts at the rate of $100 per month.[2]
Section 903 provided: "The father, mother, spouse, or other person liable for the support of a minor person, the estates of such persons, and the estate *5 of such minor person, shall be liable for the cost of his care, support, and maintenance in any county institution in which he is placed, detained, or committed pursuant to the order of the juvenile court, or for the cost to the county in which the juvenile court making the order is located, of his care, support, and maintenance in any other place in which he is placed, detained, or committed pursuant to the order of the juvenile court. The liability of such persons (in this article called relatives) and estates shall be a joint and several liability."[3]
(1a) Statutes requiring responsible relatives to reimburse governmental agencies for support have been sustained against claims of denial of equal protection. In Swoap v. Superior Court (1973) 10 Cal.3d 490 [111 Cal. Rptr. 136, 516 P.2d 840], this court upheld statutes requiring responsible adult children to support needy or poor elderly parents and providing that the children must reimburse the state for support provided by it to the parents. Pointing out that a long tradition of law and a measureless history of societal custom had established the duty of adult children to support their poor parents, the court concluded that the duty imposed by the statutes bears a rational relationship to the accomplishment of the state purpose of relieving the public treasury and that the statutes do not arbitrarily charge one class of society for the cost of public assistance. (10 Cal.3d at pp. 502-507.)
In re Ricky H. (1970) 2 Cal.3d 513 [86 Cal. Rptr. 76, 468 P.2d 204] upheld a statute requiring parents to reimburse the state for the costs of counsel in juvenile proceedings. Pointing out that legal assistance essential to protect and preserve the minor's constitutional rights comes within the parental support obligation, the court concluded that imposition of parental liability for counsel fees cannot be characterized as arbitrary or a denial of equal protection. (2 Cal.3d at p. 518 et seq.)
Similarly, medical treatment of a minor's physical injuries and care of a mentally retarded minor come within the parent's support obligation, and statutes providing for parental liability to reimburse governmental agencies providing such treatment and care have been upheld against claims of denial of equal protection. (In re Dudley (1966) 239 Cal. App.2d 401, 404 et seq. [48 Cal. Rptr. 790]; County of Alameda v. Kaiser (1965) 238 Cal. App.2d 815, 817-818 [48 Cal. Rptr. 790].)
*6 However, relative responsibility statutes have been invalidated when the government charges were not for support which the relative refused or failed to provide but for the cost of maintaining public institutions for public benefit.
(2) "A statute obviously violates the equal protection clause if it selects one particular class of persons for a species of taxation and no rational basis supports such classification. [Citations.] Such a concept for the state's taking of a free man's property manifestly denies him equal protection of the law." (Dept. of Mental Hygiene v. Kirchner (1964) 60 Cal.2d 716, 722-723 [36 Cal. Rptr. 488, 388 P.2d 720, 20 A.L.R.3d 353] [remanded 380 U.S. 194 (13 L.Ed.2d 753, 85 S.Ct. 87); subsequent opn. 62 Cal.2d 586 (43 Cal. Rptr. 329, 400 P.2d 321, 20 A.L.R.3d 361)]; see Myles Salt Co. v. Board of Com. (1916) 239 U.S. 478, 484-485 [60 L.Ed. 392, 396, 36 S.Ct. 204]; Norwood v. Baker (1898) 172 U.S. 269, 279 et seq. [43 L.Ed. 443, 447, 19 S.Ct. 187]; Furey v. City of Sacramento (1979) 24 Cal.3d 862, 874-875 [157 Cal. Rptr. 684, 598 P.2d 844]; Dawson v. Town of Los Altos Hills (1976) 16 Cal.3d 676, 684 [129 Cal. Rptr. 97, 547 P.2d 1377].) Such limitation on the government's ability to raise money has been traced to the Magna Carta and the Petition of Right. (See tenBroek, California's Dual System of Family Law: Its Origin, Development, and Present Status, Part III (1965) 17 Stan.L.Rev. 614, 643.) (1b) To charge the cost of operation of state functions conducted for public benefit to one class of society is arbitrary and violates the basic constitutional guarantee of equal protection of the law. (Id., at p. 639.)
(3) In accordance with this fundamental principle, it has been recognized that parents may not be charged for costs when adult children are incarcerated in prison or committed to state hospitals for the dangerous. Nor may adult children be charged for such incarceration or commitment of their parents. The cases have reasoned that when incarceration or commitment is for the protection of society, it is arbitrary to assess relatives for the expense. (Dept. of Mental Hygiene v. Kirchner, supra, 60 Cal.2d 716, 719-720; Department of Mental Hygiene v. Hawley (1963) 59 Cal.2d 247, 251 et seq. [28 Cal. Rptr. 718, 379 P.2d 22]; Department of Mental Hygiene v. Bank of America (1970) 3 Cal. App.3d 949, 950 et seq. [83 Cal. Rptr. 559].)
In Kirchner the court explained: "Recently in Department of Mental Hygiene v. Hawley (1963) 59 Cal.2d 247 [28 Cal. Rptr. 718, 379 P.2d 22], the department, relying upon this same section 6650, attempted to collect from a father for the cost of care, support and maintenance in a state hospital for the mentally ill or insane of his son who had been charged with crime, but before trial of the criminal issue (and obviously without adjudication of that issue) had been found by the court to be insane and committed to such *7 state hospital. (4) We there held (pp. 255-256 [6]) that `[t]he enactment and administration of laws providing for sequestration and treatment of persons in appropriate state institutions  subject of course, to the constitutional guaranties  who would endanger themselves or others if at large is a proper state function; being so, it follows that the expense of providing, operating and maintaining such institutions should (subject to reasonable exceptions against the inmate or his estate) be borne by the state.' (Italics added.) We further held that recovery could not constitutionally be had against the father of the committed patient. This holding is dispositive of the issue before us. Whether the commitment is incidental to an alleged violation of penal statute, as in Hawley, or is essentially a civil commitment as in the instant case, the purposes of confinement and treatment or care in either case encompass the protection of society from the confined person, and his own protection and possible reclamation as a productive member of the body politic. Hence the cost of maintaining the state institution, including provision of adequate care for its inmates, cannot be arbitrarily charged to one class in the society; such assessment violates the equal protection clause." (Department of Mental Hygiene v. Kirchner, supra, 60 Cal.2d at pp. 719-720.)
(5a) Whatever the basis for other commitments by the juvenile court (see §§ 300, 601), the purposes of the confinement and treatment in commitments pursuant to section 602 include "the protection of society from the confined person." (Dept. of Mental Hygiene v. Kirchner, supra, 60 Cal.2d at p. 720.)
The basis of commitment under section 602 is criminal conduct. The section provides: "Any person who is under the age of 18 years when he violates any law of this state or of the United States or any ordinance of any city or county of this state defining crime other than an ordinance establishing a curfew based solely on age is within the jurisdiction of the juvenile courts which may adjudge such person to be a ward of the court."
Section 202 as amended in 1976 and 1977 established the purposes of commitment, stating that protection of the public must be considered with the minor's welfare. That section reads: "(a) The purpose of this chapter is to secure for each minor under the jurisdiction of the juvenile court such care and guidance, preferably in his own home, as will serve the spiritual, emotional, mental, and physical welfare of the minor and the best interests of the state; to protect the public from criminal conduct by minors; to impose on the minor a sense of responsibility for his own acts; to preserve and strengthen the minor's family ties whenever possible, removing him from the custody of his parents only when necessary for his welfare or for the safety and protection of the public; and, when the minor is removed from his own family, to secure for him custody, care, and discipline as nearly as *8 possible equivalent to that which should have been given by his parents. This chapter shall be liberally construed to carry out these purposes. [¶] (b) The purpose of this chapter also includes the protection of the public from the consequences of criminal activity, and to such purpose probation officers, peace officers, and juvenile courts shall take into account such protection of the public in their determinations under this chapter." (Italics added.)
The purpose of juvenile commitment proceedings "to protect the public from criminal conduct by minors" (§ 202) rehabilitation, and treatment (In re Eric J. (1979) 25 Cal.3d 522, 531-532 [159 Cal. Rptr. 317, 601 P.2d 549]; In re Aline D. (1975) 14 Cal.3d 557, 567 [121 Cal. Rptr. 816, 536 P.2d 65]) brings the commitment squarely within the rule of Kirchner. "[T]he purposes of confinement and treatment or care ... encompass the protection of society from the confined person, and his own protection and possible reclamation as a productive member of the body politic. Hence the cost of maintaining the state institution, including provision of adequate care for its inmates, cannot be arbitrarily charged to one class in the society; such assessment violates the equal protection clause." (60 Cal.2d at p. 720.)
While it is true that section 602 proceedings are not technically criminal[4] and commitment of a juvenile under the section is not for the purpose of punishment or a conviction (§ 203; In re Eric J., supra, 25 Cal.3d 522, 531-532; In re Aline D., supra, 14 Cal.3d 557, 567), it is apparent from Kirchner and Hawley that these are not determinative factors. Kirchner involved commitment of a mentally ill person who was neither charged nor convicted of crime; although in Hawley the child was charged with crime, the criminal proceedings were suspended at the time of commitment, there was no conviction, and confinement was not for the purpose of punishment. As was true in Kirchner and Hawley, commitment under section 602 is not for the purpose of providing support and maintenance for the committed person but for the purpose of protecting society.
The county seeks to distinguish Kirchner and Hawley on the ground that the obligation to support a minor child is a common law obligation whereas the obligation to support an adult child or parent is a statutory obligation. However, the duty to reimburse for support and maintenance imposed by section 903 goes beyond the common law duty codified in Civil Code section 207. Under the latter code section the liability of parents to reimburse third parties who provide support applies only where a parent "neglects" *9 to provide support, and there is no liability to private parties when the child abandons the parent without cause. (Civ. Code, § 208.) Section 602 commitments are not based on a refusal or failure to provide support. Ordinarily the parents are willing to provide support, but the state by taking custody has deprived them of the opportunity to provide the ordinary support of their child.
In seeking reimbursement of expenses incurred in section 602 commitments, the county is not seeking recovery of expenditures for support of the minor, but expenses for confinement for the protection of society. Although parents of children committed under section 602 are thereby relieved of their ordinary burden of support, the reimbursement provision of section 903 is not based on such burden but upon the governmental cost of confinement. And it is apparent from the reimbursement sought in the instant case that the charges were not limited to the reasonable cost of support in a home but included confinement costs.
Moreover, common law and statutory origin furnish no basis for the urged distinction because the statutory duty to provide support for needy parents and adult children has existed for so long. As pointed out in Swoap v. Superior Court, supra, 10 Cal.3d 490, it "is abundantly clear that children have generally been subject to a duty to support poor parents for a very long time, indeed. It is true, as stated in Kirchner and Boss, that there was no such duty at common law. Nevertheless, the duty is deep rooted and of venerable ancestry; it can be traced back over almost four centuries to the year 1601, when it emerged as part and parcel of the Elizabethan Poor Law. (43 Eliz. 1, ch. 2, § vi (1601).)[11] Professor tenBroek has clearly demonstrated that `legal liability of relatives [imposed by the Elizabethan Poor Law] was designed to indemnify the public and to minimize its costs in relieving the poor.' (tenBroek, supra, 16 Stan.L.Rev. 257, 283.)
(6) "This duty, codified in California in 1872 as section 206 of the Civil Code in language remarkably similar to the Elizabethan Poor Law, has existed unchanged until the recent 1971 amendment. (See fn. 4, ante.) The purpose of such legislation is identical to that underlying the Elizabethan Poor Law: `It has been stated that the "main purpose of the statutes seems *10 to be to protect the public from the burden of supporting people who have children able to support them." (Duffy v. Yordi, supra, 149 Cal. at p. 142 [citation].' (Gluckman v. Gaines (1968) 266 Cal. App.2d 52, 54 [71 Cal. Rptr. 795].)" (10 Cal.3d at pp. 502-503.)
(5b) As in Swoap, the long tradition of law and history of societal custom of a duty to support poor adult children and parents must be deemed the substantial equivalent of the common law duty to support minor children. The duties may not be distinguished in terms of the state's right to reimbursement. On the one hand the state, in accordance with Swoap, may obtain reimbursement for support allowances paid to or for minors. On the other hand the common law duty to support minor children does not authorize the state to recover the costs of confinement imposed for the protection of society and the minor and his rehabilitation. Under Kirchner those costs may not be recovered when an adult is confined for the protection of society, and they may not be recovered when minors are placed in custody for the protection of society.
It is urged that while the county may not recover the costs of confinement and treatment, it should be permitted to recover costs incurred in supporting and maintaining the juvenile based on the parental common law duty and cases upholding responsible relative statutes in other situations. Even assuming that it is economically feasible to segregate the types of costs borne by the institutions and to allocate in a reasonable manner a portion of the costs to each juvenile, we must reject the proposed allocation for the following reasons. The allocation would be equally possible in the Kirchner and Hawley situations, but neither case permitted the allocation, and the allocation would involve partial repudiation of well-settled principles of law. As pointed out above, the section 903 reimbursement goes beyond the parental duty of reimbursement imposed by section 207 because there is no reason to believe that absent commitment the parents would refuse or fail to provide the support themselves. The purpose of the section 602 commitment is to exercise control over the juvenile for the benefit of society. The state's purpose is not to provide support and maintenance as was true in Swoap v. Superior Court, supra, 10 Cal.3d 49 (welfare payments), In re Ricky H., supra, 2 Cal.3d 513 (attorney services), and In re Dudley, supra, 239 Cal. App.2d 401 (medical care).
Our conclusion that the county may not recover its costs does not mean that parents will be unjustly enriched. One of the greatest misfortunes a parent may suffer is the incarceration of offspring for crime. To imply that the avoidance of support obligation balances or exceeds such misfortune would betray a misguided sense of values. Incarcerating the child, the state *11 neither intends nor provides benefits to the parents. The state's purpose and the benefits provided are for society generally.
Rejecting equal protection challenges, three Court of Appeal decisions have upheld the right of the county to obtain reimbursement from the parents of a minor committed under section 602. (In re Steven S. (1981) 122 Cal. App.3d 683, 685-687 [176 Cal. Rptr. 195]; In re Shaieb (1967) 250 Cal. App.2d 553, 556 et seq. [58 Cal. Rptr. 631]; County of Alameda v. Espinoza (1966) 243 Cal. App.2d 534, 541-544 [52 Cal. Rptr. 480].) The cases sought to distinguish Kirchner and Hawley on the grounds that the purpose of commitment is substantially different from the purpose of commitment of an adult and that the obligation of a parent to support a minor child is a common law obligation, not a statutory one. However, neither reason warrants a distinction. As demonstrated above, the purpose of the juvenile commitment under section 602 includes protection of the public, rehabilitation, and treatment  the same purposes involved in Kirchner and Hawley  and the statutory duty to support needy parents and adult children has existed for so long as to preclude distinction based on common law and statutory origin. Insofar as contrary to the views expressed above, In re Steven S., supra, 122 Cal. App.3d 683, In re Shaieb, supra, 250 Cal. App.2d 553, and County of Alameda v. Espinoza, supra, 243 Cal. App.2d 534, are disapproved.
The order appealed from is reversed.
Bird, C.J., and Mosk, J., concurred.
KAUS, J., Concurring.
This litigation has been pending far too long. Since the fault is chiefly, if not exclusively, mine, I shall try to help us close the book on this case by being brief.
When the court filed its first opinion, I felt that it painted with too broad a brush. I said so in a concurring and dissenting opinion in which I was joined by Justice Reynoso. I still feel the same way. My basic theory is this: it is undeniable that equal protection principles do not permit us to saddle a tiny segment of the public with the cost of protecting society from persons who, for one reason or another, must be confined in institutions. Yet if such a person has someone who is legally responsible for supporting him with the necessaries of life  food, clothing, shelter  I see no reason why the state cannot charge the responsible party for whatever he saves by not having to support the person "on the outside." The plurality suggests that such a scheme "would betray a misguided sense of values." Perhaps *12 so, but it is not for us to make value judgments concerning legislation which passes constitutional muster.[1]
It was my original belief that we already had such legislation on the books and that all we had to do was to remand these proceedings to the trial court to determine whether the county was attempting to charge Jerald's father for costs which exceeded the reasonable value of his parental obligation  in other words, whether the father was being charged for the cost of incarceration. I have, however, concluded that the problem is far more complicated  substantively and administratively  and that the applicable statutory scheme does not lend itself to an efficient segregation between those costs which may legitimately be charged to the parent and those which are the responsibility of the general public. I will briefly explain some of the reasons which caused me to change my mind.
To begin with, it now seems clear to me that isolating and disallowing the cost of security would not, in itself, cure all the constitutional problems in this area. The cost of supporting a minor in a county institution may, in dollars and cents, often exceed the preexisting support obligation of a particular parent. It is sad but true that from a purely material point of view, for many minors confinement in juvenile hall is a step up. As noted above, my understanding of what equal protection principles  as set forth in Dept. of Mental Hygiene v. Kirchner (1964) 60 Cal.2d 716 [36 Cal. Rptr. 488, 388 P.2d 720, 20 A.L.R.3d 353]  allow and what they forbid, leads to the inevitable conclusion that a parent cannot be compelled to foot the bill for a minor's improvement in living standards, when such improvement is triggered by the need to detain the minor for the public good. Therefore, any system of exacting from a parent part of the cost of maintaining a minor in a public institution must be capable of taking into account at least the approximate level of that parent's support obligation. The statutes in force at the time the order before us was entered are inefficient tools for such fine tuning.
In these statutes, the Legislature had devised a straightforward statutory scheme under which each county legislatively determined the total cost of confining the minor (Welf. & Inst. Code, § 904) and the parent became *13 obligated to pay the full amount thus fixed (former § 903),[2] subject only to remission of sums which the county probably could not collect in the first place.[3] The only factual issue which could arise under that scheme was the parent's ability to pay. If we were to attempt to mold this crude statutory framework to constitutional imperatives, each attempt to collect a few hundred dollars could turn into a complex trial involving tricky questions of classification  support vs. security  cost accounting, and the proper level of the parental support obligation.[4] It is anyone's guess whether under such circumstances the Legislature would deem attempts to obtain reimbursement under section 903 cost effective.
Nor would all this litigating bring much light into this dark corner of the law. Judicial horizons are necessarily limited by the factual and legal issues which parties choose to frame. The Legislature, on the other hand, has a bird's eye view of the entire problem and could do much to simplify collections while maintaining constitutional standards. First, having in mind the diverse expenses that are actually incurred by the counties and the state in juvenile institutions, it can  subject to Kirchner standards  decide which of these expenses should appropriately be charged to parents. Second, considering the need for careful segregation of program costs, the Legislature may want to establish guidelines, so that all counties will make comparable charges for comparable services. Third  and most vitally  because the amount that a parent may be charged will necessarily vary with the parent's circumstances during the minor's confinement, the Legislature may well find that efficiency and fairness demand the establishment of a schedule of graduated fees, tailored as near as may be to the particular parent's support *14 obligation. (Cf. Swoap v. Superior Court (1973) 10 Cal.3d 490, 508-510 [111 Cal. Rptr. 136, 516 P.2d 840] [relatives' contribution scale as embodied in former § 12101].)
In sum, although I believe that the state may constitutionally require responsible parents to pay a part of the cost of maintaining a minor in a county institution, I conclude that we should not attempt to bend the statutory framework applicable to this case into constitutional shape, but rather should leave the Legislature to address several practical questions in light of the constitutional principles discussed.[5]
Accordingly, I concur in the judgment.
Reynoso, J., Grodin, J., and Richardson, J.,[*] concurred.
NOTES
[1] Unless otherwise indicated, all section references are to the Welfare and Institutions Code.
[2] Jerald was born out of wedlock in 1965, and appellant was adjudicated the father in 1967 and was ordered to pay $50 per month child support. The support order has not been modified. Appellant is married, and he and his wife have children.
[3] After we granted a rehearing in this case, the Legislature rewrote section 903 and amended section 202. (Stats. 1983, ch. 1135, §§ 1-3, p. ___.) The new legislation is not applicable to this case.

Although the record is not clear, the $25 charge by the county while the child is committed to the Youth Authority is apparently an attempt by the county to recover the $25 it must pay to the state for each month that the child is committed to the Youth Authority. (§ 912.) If so, it would seem that the cost is a confinement rather than support cost.
[4] Recently the Court of Appeal acknowledged the "widely held belief" that under current practices juvenile court proceedings under section 602 are in reality criminal proceedings, and that the claim that such proceedings are for the protection of the minor is "pure fiction." (In re Gregory K. (1980) 106 Cal. App.3d 164, 168 [165 Cal. Rptr. 35].)
[11] "`[The parents, grandparents, and the children of] everie poore olde blind lame and impotente person, or other poore person not able to worke, beinge of a sufficient abilitie, shall at their owne Chardges releive and maintain everie suche poore person, in that manner and accordinge to that rate, as by the Justices of the Peace of that Countie where suche sufficient persons dwell, or the greater number of them, at their general Quarter-Sessions shalbe assessed; upon paine that everie one of them shall forfeite twenty shillings for everie monthe which they shall faile therein.' (Fn. omitted.) (tenBroek, California's Dual System of Family Law: Its Origin, Development, and Present Status, Part I (1964) 16 Stan.L.Rev. 257, 283.)"
[1] After we granted a rehearing in this case, the 1983 Legislature amended section 202 and rewrote section 903 of the Welfare and Institutions Code. (Stats. 1983, ch. 1135, §§ 1-3, p. ___.) This legislation  summarized in footnote 5, infra  does not, of course, affect the parties to this dispute.
[2] A number of decisions demonstrate both the kind of expenses that were considered in computing the relevant cost figures under the applicable statutes and the level of "support payments" that such computations could yield. In In re Shaieb (1967) 250 Cal. App.2d 553, 556 [58 Cal. Rptr. 631], the judgment  affirmed on appeal  was calculated as follows: "The cost per day for the boy's stay at Juvenile Hall from August 14 to August 29, 1963 was derived from the total cost of maintaining the Juvenile Hall divided by the population of the six months period last computed by the county auditor. It included salaries and wages of Juvenile Hall staff: superintendent, counselors, cooks, etc.; maintenance and operation; food; and probation department administrative and accounting charges." In In re Steven S. (1981) 122 Cal. App.3d 683, 685 [176 Cal. Rptr. 195], the costs claimed by Los Angeles County  presumably on the basis of a similar accounting formula  were accumulating at a monthly rate of $2,460!
[3] Both former section 905 and present section 903.4  in effect since September 22, 1982 (Stats. 1982, ch. 1276, § 5, p. 4712)  contain provisions limiting orders for reimbursement pursuant to section 903 to the parent's ability to pay at the time of the attempted collection. While in most cases there may be little difference, on a dollar and cents basis, between the level of the parents' support obligation at the time of confinement and his or her ability to meet that obligation at the time of collection, the two concepts are legally quite distinct.
[4] The court might also have to consider whether before the commitment the juvenile was providing, in whole or in part, for his own support out of his own earnings. If so, the commitment might not relieve the parents of any financial burden.
[5] I express no view whether the 1983 legislation referred to in footnote 1, ante, meets constitutional standards. In brief summary, the legislation: (1) amends section 202 of the Welfare and Institutions Code by adding a subdivision which declares that one of the purposes of the Juvenile Court Law is to reaffirm that, subject to financial ability, a parent must support a minor child even if the child is removed from the parent's custody; and (2) rewrites section 903 to provide that this continuing responsibility does not include the cost of "incarceration, treatment, or supervision for the protection of society and the minor and the rehabilitation of the minor."
[*] Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.